## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

BCS SOFTWARE, LLC,

      Plaintiff

v.

CODELATHE TECHNOLOGIES,
INC.

      Defendant

Case No. 6:21-cv-0027-ADA

By and through its undesigned counsel, Defendant CodeLathe Technologies, Inc.,

("CodeLathe") hereby respectfully answers Plaintiff's Amended Complaint, and serves its

Affirmative Defense and Counterclaims.

### THE PARTIES

1.    CodeLathe lacks knowledge or information sufficient to form a belief about the

truth of the allegation in this paragraph and therefore denies same.

2.    Admitted.

### JURISDICTION AND VENUE

3.    Admitted.

4.    Denied.

5.    Admitted.

6.    Admit that this Court has jurisdiction over defendant given its principal place of

business in this jurisdiction; as to any allegations of infringement in this district, denied.

7.      Admit that CodeLathe offers for sale its products on this district.  As to the remaining allegations, denied.

8.      Admitted.

## US PATENT NO. 8,819,120

9.      CodeLathe lacks knowledge or information sufficient to form a belief about the truth of the allegation in this paragraph and therefore denies same.

10.     Denied.

11.     Denied.

12.     As for priority, CodeLathe lacks sufficient information and denies same.  As for the remainder, denied.

13.     Denied.

14.     Denied.

15.     Denied.

16.     Admit that the quoted language from the '120 Patent accurately reflects the language in the Patent.  Admit that the claims of the '120 Patent are drawn toward a collaborative platform.  Admit that the claims of the '120 Patent allow for "interactions" between the users.  As to remainder, denied.

## [ALLEGED] NOTICE OF BCS' PATENTS

17.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.[1]

---

[1] Paragraphs 17-36 are not properly alleged in this complaint and may factor toward an award of fees under Section 35 U.S.C § 285 or 28 U.S.C. § 1927.  Indeed, Plaintiff and its counsel provided the same "notice" to each company sued under the '120 Patent, even though each of the

18.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

19.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

20.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

21.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

22.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

23.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

24.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

---

companies have different business models and accused products.  *See* Case Nos. 6:21-cv-0019, Complaint, ¶¶17-36; 6:21-cv-0050 (same); 6:21-cv-0050; 6:21-0051 (same).  Those sections of the complaints appear to be cut and paste.

25.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

26.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

27.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

28.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

29.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

30.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

31.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

32.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

33.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

34.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

35.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

36.     Denied that this paragraph provides any "notice" under the patent laws; as to the remaining facts in this paragraph, CodeLathe lacks sufficient information about their truth and therefore denies same.

## DEFENDANT'S PRODUCTS

37.     Admitted.

38.     Denied.

## COUNT 1

### (Infringement of US Patent No. 8,819,120)

39.     No allegations are contained in this paragraph.

40.     Admit that CodeLathe has been on notice of the asserted 120 Patent since service of the Complaint.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Admit that the claim set forth in this paragraph is Claim 1 of the '120 Patent.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Admit that the claim set forth in this paragraph is Claim 2 of the '120 Patent.

54.     Denied.

55.     Admit that the claim set forth in this paragraph is Claim 3 of the '120 Patent.

56.     Denied.

57.     Denied.

58.     Denied.

## PRAYER FOR RELIEF

CodeLathe denies that Plaintiff is entitled to any relief so requested.

## AFFIRMATIVE DEFENSE: NON-INFRINGEMENT

1.     The asserted '120 Patent and the accused FileCloud systems are fundamentally different systems, employing fundamentally different architectures.

2.      The '120 Patent covers a "collaborative platform".  *See, e.g.,* '120, 1:17-18, 2:39-40, 3:66-67, etc; Complaint, Dkt. No. 1, at ¶16.

3.      The '120 Patent, "provides a true group (collaborative) communication platform or system that allows users registered with the system <u>to communicate with each other</u> without intrusion from others outside the system."  2:39-42 (emphasis added); Complaint, at ¶16.

4.      FileCloud is not a collaborative platform as claimed by the '120 Patent.

5.      FileCloud employs a REST-based server.  As such, communications are never initiated by the server; the client [e.g., "client machine" one] sends the request to the server and the server responds to client machine one alone.

6.      That is, client machine one will send operations (HTTP methods) such as GET, HEAD, POST, PUT, PATCH, DELETE, CONNECT, OPTIONS and TRACE, and the server will respond.[2]  Client machine one's HTTP requests are never sent to client machine two via the server.

7.      That is, FileCloud client machines do not communicate with each other via a server intermediary.

8.      FileCloud is a browser-based file sharing platform, allowing for complete data control and governance, wherein the client machines communicate with the server, not with each other via a server intermediary.[3]

9.      For example, the asserted claims of the '120 Patent require "receiving by the server a request from a first client machine <u>to establish a connection with a second client machine</u>".  '120, 17:9-10.

---

[2] https://tools.ietf.org/html/rfc7231#section-4
[3] *See* https://www.getfilecloud.com

10. And, "forwarding the request <u>by the server</u> to the second client machine". *Id.*, at 17:11-12.

11. And, "permitting the first client machine to communicate with the second client machine <u>via the server</u> in response to the second client machine granting the request". *Id.*, at 17:13-15.

12. None of this happens with FileCloud.

13. With FileCloud, the "client computer" (a computer, mobile phone, or any device with access to a browser) never connects and never communicates with other "client computers" via a server intermediary.

14. FileCloud is implemented as a pure HTTP protocol, which was not prevalent at the priority date of the '120 Patent (2004) but now underpins the entire modern internet.

15. In HTTP protocol, there is a pure client to server communication, where the server only responds to the client. The server does not forward or initiate a connection with a second client.

16. Again, the architecture of FileCloud is fundamentally different than the claims of the asserted patent.

17. The claimed method works by establishing a network connection to the server and through the server the users communicate with other machines that are also connected to the server.



18. This is illustrated in the bi-directional arrows in FIG 1A:



**Fig. 1A**

19.     As shown in FIGA and as claimed in each asserted claim, "Machines 111-113 are coupled to a network 110 that may be the same as the network 108 or a different network. A server 102 couples the networks 108 and 110 <u>and facilitates communications between the two networks</u>." '102, 4:49-52.

[remainder of page intentionally left blank]

20.    By way of further illustration, Claim 1, limitation (b) states, "forwarding the request by the server to the second client machine".

21.    The operation at limitation (b) can as illustrated as follows:



[remainder of page intentionally left blank]

22.     Conversely, with FileCloud, each client communicates with the server, but the server never forwards a request from one client to another:



59.     In sum, FileCloud cannot infringe the claims of the '120 Patent.

60.     Plaintiff BCS repeatedly cites to FileCloud's website in its complaint.  *See* Complaint, ¶¶46-56.

61.     BCS or its agents viewed FileCloud's website as part of its pre-suit due diligence.

62.     The FileCloud website explains the FileCloud architecture in detail.

63.     For example, on its website FileCloud includes the following illustrations of its architecture:



([https://www.getfilecloud.com/supportdocs/display/cloud/About+FileCloud+Server+for+Administrators](https://www.getfilecloud.com/supportdocs/display/cloud/About+FileCloud+Server+for+Administrators))

64.     The FileCloud architecture documents on FileCloud's website make clear that the architecture is a client to server only data flow architecture.

65.     For example, the FileCloud website makes clear it employs an apache server (https://www.getfilecloud.com/supportdocs/display/cloud/Requirements ), which is only an HTTP server.

66.      An HTTP server does not perform the methods as claimed, e.g., does not forward requests from one client to another.

67.     Any reasonable due diligence would have located the architecture documents on FileCloud's website.

68.     Indeed, nearly every limitation in the asserted claims fail to map onto the accused system.

69.     For example, the server does not notify the second client machine of the file as alleged.  When a user wishes to share a file, she obtains a link to that file that can be shared personally by the user, or a link is sent via email:



70.     Again, the server does not notify a second user of any shared files as alleged.

71.     The "smart notifications" functionality cited in the Complaint comprises email notifications.

72.     BCS or its counsel hired or otherwise engaged Copperpod.

73.     Copperpod obtained a FileCloud trial account in order to evidence BCS' allegations.  *See* Complaint, at pps. 17, 25, 29, 36.[4]

74.     Copperpod is a legal outsourcing company based in India.

75.     Even though BCS' agent Copperpod had a trial account and used its free trial account to share files via email (if they shared files at all), Copperpod and BCS represented in the Complaint that files were shared via the server.  Complaint, at ¶52.

---

[4] The person who accessed the free trial appears to be or share a name with the CEO of Copperpod, Rahul Vijn, https://www.linkedin.com/in/rahulvijh/ .  *See* Complaint, at pps. 17, 25, 29, 36.

76.     But as BCS and its agents understand from their free trial, shared files are sent via email or by otherwise sharing a link outside the FileCloud system, not via the FileCloud server.





77.     Which means that BCS understands that clients in the FileCloud system do not receive notifications "via the server" in the manner alleged.

[remainder of page intentionally left blank]

78.     Further, during prosecution of the asserted patent, the patentee distinguished prior art as follows:

> **Claim 1**
>
> Currently amended Claim 1 recites, in part (*emphasis added*):
>
> > establishing *a level of access* to the file list coupled to the store, *wherein the store is independent of a file path and unnavigable to by a user*.
>
> The Office Action on page 5 alleges that the above previously recited features of Claim 1 are taught by Simonoff as follows (*original emphasis*):
>
> > Establishing a file list including access to the file independent of a file path of the file in the store; (Simonoff Figure 6; col 10, ll 13-22: webpage listing of files available for downloading to a client; server maintains a list of files which are uploaded to it, specific client originating the upload, address of machine origination upload, identity of user performing upload; (no URL (i.e. link) is displayed as to location of file))
>
> Applicant disagrees.
>
> Simonoff describes at col. 10, lines 15-20 that the "White Board server 102 advantageously maintains… *the specific client originating the upload, the address, e.g., numerical address of the machine originating the upload*." Simonoff further describes at col. 10, lines 20-22 the rationale for the above address tracking, "Maintaining this information permits the White Board administrator *to track information on file uploads and downloads, i.e., promotes traceability*." Therefore, Applicant respectfully submits that Simonoff, quite simply fails to teach or suggest, "establishing *a level of access* to the file list coupled to the store, *wherein the store is independent of a file path and unnavigable to by a user*," as recited in **Claim 1**. Rather, Simonoff explicitly describes at col. 10, lines 15-22 that the "White Board administrator" tracks "information on file uploads and downloads," to promote "**traceability.**"

('120 Prosecution History, 3/27/14 Remarks, at 10-11.)

79.     But in FileCloud, the files are completely and imminently traceable:

This opens the **Share Link** window.  To view a list of actions on the share, click the **Share History** tab.
Each action is listed with the name of the user who performed the action (if known), the location where the action was performed, and how long ago the action was performed.



([https://www.getfilecloud.com/supportdocs/display/cloud/Share+History](https://www.getfilecloud.com/supportdocs/display/cloud/Share+History) )

---

## Governance and Retention

FileCloud, on the other hand, lets administrators automate all processes related to protecting sensitive files. For instance, administrators can create a retention policy that disables a user's ability to delete or edit any of the files and folders named in the policy. To resolve the issue of conflicting policies. FileCloud gives your system administrators the ability to control how files are retained and deleted, as well as policies such as legal hold, archival and retention for an unlimited amount of time.

Box offers a similar retention policy system, which is an impressive feature to have in any sort of Cloud Enterprise File Sharing and Sync solution! We were certainly very impressed to see another solution match us in terms of data governance, as data security is one of our very top priorities.

---

([https://www.getfilecloud.com/blog/2021/02/29513/#.YByJ6C2z2hw](https://www.getfilecloud.com/blog/2021/02/29513/#.YByJ6C2z2hw))

---

## Auditing Features

Box provides a very impressive array of auditing features for system administrators to keep track of. With an access-monitoring control panel, detailed audit reports, geo IP access reports, pattern search and role-based administration, Box definitely shines in terms of logging user actions. However, mobile device management (which is vital in today's age of working on-the-go) is only offered to Enterprise Plan users. Box also lacks file analytics, which typically report a summary of client applications according to OS and type, user shares, active file-management, and file type distribution.

FileCloud offers a much more detailed audit log, with all of the above and the following additions: new account creations, logged-in users, common searches and the quantity of uploaded/downloaded files. Because just about every operation is optionally logged, we also offer the following log-management tools to avoid overly large audit database entries: removal of log entries with the administrative dashboard, configurable limits for which operations are logged and exportable .CSV archive log files.

---

(*Id.*)

80.     That is, like Siminoff and unlike the claims of the '120 Patent, FileCloud tracks the store activity and the administrator has full tracking access.

81.     In sum, FileCloud does not infringe the claims of the '120 Patent and any reasonable due diligence would have rendered that conclusion.  Indeed, BCS' due diligence appears to have demonstrated non-infringement but was ignored by BCS.

<u>**CODELATHE'S COUNTERCLAIMS**</u>

**The Parties**

1.     BCS Software, LLC alleges that it is a limited liability company organized and existing under the laws of the Texas with its principal place of business at 600 Columbus Avenue, Suite 106, #7, Waco, Texas 76701.

2.     CodeLathe Technologies, Inc. is a corporation organized and existing under the laws of Texas, with a regular and established place of business located at 13785 Research Blvd #125, Austin, TX 78750.

**Jurisdiction and Venue**

3.      This Honorable Court has jurisdiction over BCS Software because it is a Texas corporation and filed this instant action.

4.      This Honorable Court has jurisdiction over CodeLathe's counterclaims as they arise out of a common nucleus of operative facts.

5.      Venue is proper in this district because both Parties are Texas corporations.

## COUNTERCLAIM 1:

## NON-INFRINGEMENT

6.      The asserted '120 Patent and the accused FileCloud systems are fundamentally different systems, employing fundamentally different architectures.

7.      The '120 Patent covers a "collaborative platform". *See, e.g.,* '120, 1:17-18, 2:39-40, 3:66-67, etc; Complaint, Dkt. No. 1, at ¶16; Amended Complaint, Dkt. No. 19, at ¶16.

8.      The '120 Patent, "provides a true group (collaborative) communication platform or system that allows users registered with the system to communicate with each other without intrusion from others outside the system."  2:39-42 (emphasis added); Complaint, at ¶16.

9.      FileCloud is not a collaborative platform as claimed by the '120 Patent.

10.     FileCloud employs a REST-based server.  As such, communications are never initiated by the server; the client [e.g., "client machine" one] sends the request to the server and the server responds to client machine one alone.

11.     That is, client machine one will send operations (HTTP methods) such as GET, HEAD, POST, PUT, PATCH, DELETE, CONNECT, OPTIONS and TRACE, and the server will respond.[5]  Client machine one's HTTP requests are never sent to client machine two via the server.

---

[5] https://tools.ietf.org/html/rfc7231#section-4

12.     That is, FileCloud client machines do not communicate with each other via a server intermediary.

13.     FileCloud is a browser-based file sharing platform, allowing for complete data control and governance, wherein the client machines communicate with the server, not with each other via a server intermediary.[6]

14.     For example, the asserted claims of the '120 Patent require "receiving by the server a request from a first client machine to establish a connection with a second client machine".  '120, 17:9-10.

15.     And, "forwarding the request by the server to the second client machine".  *Id*., at 17:11-12.

16.     And, "permitting the first client machine to communicate with the second client machine via the server in response to the second client machine granting the request".  *Id*., at 17:13-15.

17.     None of this happens with FileCloud.

18.     With FileCloud, the "client computer" (a computer, mobile phone, or any device with access to a browser) never connects and never communicates with other "client computers" via a server intermediary.

19.     FileCloud is implemented as a pure HTTP protocol, which was not prevalent at the priority date of the '120 Patent (2004) but now underpins the entire modern internet.

20.     In HTTP protocol, there is a pure client to server communication, where the server only responds to the client.  The server does not forward or initiate a connection with a second client.

---

[6] *See* https://www.getfilecloud.com

21.    Again, the architecture of FileCloud is fundamentally different than the claims of the asserted patent.

22.    The claimed method works by establishing a network connection to the server and through the server the users communicate with other machines that are also connected to the server.



23.    This is illustrated in the bi-directional arrows in FIG 1A:



***Fig. 1A***

24.    As shown in FIGA and as claimed in each asserted claim, "Machines 111-113 are coupled to a network 110 that may be the same as the network 108 or a different network. A server 102 couples the networks 108 and 110 <u>and facilitates communications between the two networks</u>." '102, 4:49-52.

25.    By way of further illustration, Claim 1, limitation (b) states, "forwarding the request by the server to the second client machine".

26.     The operation at limitation (b) can as illustrated as follows:



[remainder of page intentionally left blank]

27.     Conversely, with FileCloud, each client communicates with the server, but the server never forwards a request from one client to another:



82.     In sum, FileCloud cannot infringe the claims of the '120 Patent.

83.     Plaintiff BCS repeatedly cites to FileCloud's website in its complaint.  *See* Complaint, ¶¶46-56.

84.     BCS or its agents viewed FileCloud's website as part of its pre-suit due diligence.

85.     The FileCloud website explains the FileCloud architecture in detail.

86.     For example, on its website FileCloud includes the following illustrations of its architecture:



([https://www.getfilecloud.com/supportdocs/display/cloud/About+FileCloud+Server+for+Administrators](https://www.getfilecloud.com/supportdocs/display/cloud/About+FileCloud+Server+for+Administrators))

87.     The FileCloud architecture documents on FileCloud's website make clear that the architecture is a client to server only data flow architecture.

88.     For example, the FileCloud website makes clear it employs an apache server (https://www.getfilecloud.com/supportdocs/display/cloud/Requirements ), which is only an HTTP server.

89.      An HTTP server does not perform the methods as claimed, e.g., does not forward requests from one client to another.

90.     Any reasonable due diligence would have located the architecture documents on FileCloud's website.

91.     Indeed, nearly every limitation in the asserted claims fail to map onto the accused system.

92.   For example, the server does not notify the second client machine of the file as alleged.  When a user wishes to share a file, she obtains a link to that file that can be shared personally by the user, or a link is sent via email:



93.   Again, the server does not notify a second user of any shared files as alleged.

94.   The "smart notifications" functionality cited in the Complaint comprises email notifications.

95.   BCS or its counsel hired or otherwise engaged Copperpod.

96.   Copperpod obtained a FileCloud trial account in order to evidence BCS' allegations.  *See* Complaint, at pps. 17, 25, 29, 36.[7]

97.   Copperpod is a legal outsourcing company based in India.

98.   Even though BCS' agent Copperpod had a trial account and used its free trial account to share files via email (if they shared files at all), Copperpod and BCS represented in the Complaint that files were shared via the server.  Complaint, at ¶52.

---

[7] The person who accessed the free trial appears to be or share a name with the CEO of Copperpod, Rahul Vijn, https://www.linkedin.com/in/rahulvijh/ .  *See* Complaint, at pps. 17, 25, 29, 36.

99.     But as BCS and its agents understand from their free trial, shared files are sent via email or by otherwise sharing a link outside the FileCloud system, not via the FileCloud server.





100.    Which means that BCS understands that clients in the FileCloud system do not receive notifications "via the server" in the manner alleged.

[remainder of page intentionally left blank]

101.    Further, during prosecution of the asserted patent, the patentee distinguished prior art as follows:

> **Claim 1**
>
> Currently amended Claim 1 recites, in part (*emphasis added*):
>
>> establishing ***a level of access*** to the file list coupled to the store, ***wherein the store is independent of a file path and unnavigable to by a user***.
>
> The Office Action on page 5 alleges that the above previously recited features of Claim 1 are taught by Simonoff as follows (*original emphasis*):
>
>> <u>Establishing a file list including access to the file independent of a file path of the file in the store;</u> (Simonoff Figure 6; col 10, ll 13-22: webpage listing of files available for downloading to a client; server maintains a list of files which are uploaded to it, specific client originating the upload, address of machine origination upload, identity of user performing upload; (no URL (i.e. link) is displayed as to location of file))
>
> Applicant disagrees.
>
> Simonoff describes at col. 10, lines 15-20 that the "White Board server 102 advantageously maintains... ***the specific client originating the upload, the address, e.g., numerical address of the machine originating the upload***." Simonoff further describes at col. 10, lines 20-22 the rationale for the above address tracking, "Maintaining this information permits the White Board administrator ***to track***
>
> ***information on file uploads and downloads, i.e., promotes traceability***." Therefore, Applicant respectfully submits that Simonoff, quite simply fails to teach or suggest, "establishing ***a level of access*** to the file list coupled to the store, ***wherein the store is independent of a file path and unnavigable to by a user***," as recited in **Claim 1**. Rather, Simonoff explicitly describes at col. 10, lines 15-22 that the "White Board administrator" tracks "information on file uploads and downloads," to promote "**traceability.**"

('120 Prosecution History, 3/27/14 Remarks, at 10-11.)

102.    But in FileCloud, the files are completely and imminently traceable:

This opens the **Share Link** window.  To view a list of actions on the share, click the **Share History** tab.
Each action is listed with the name of the user who performed the action (if known), the location where the action was performed, and how long ago the action was performed.



([https://www.getfilecloud.com/supportdocs/display/cloud/Share+History](https://www.getfilecloud.com/supportdocs/display/cloud/Share+History) )

---

### Governance and Retention

FileCloud, on the other hand, lets administrators automate all processes related to protecting sensitive files. For instance, administrators can create a retention policy that disables a user's ability to delete or edit any of the files and folders named in the policy. To resolve the issue of conflicting policies. FileCloud gives your system administrators the ability to control how files are retained and deleted, as well as policies such as legal hold, archival and retention for an unlimited amount of time.

Box offers a similar retention policy system, which is an impressive feature to have in any sort of Cloud Enterprise File Sharing and Sync solution! We were certainly very impressed to see another solution match us in terms of data governance, as data security is one of our very top priorities.

---

([https://www.getfilecloud.com/blog/2021/02/29513/#.YByJ6C2z2hw](https://www.getfilecloud.com/blog/2021/02/29513/#.YByJ6C2z2hw))

| Auditing Features |
| --- |
| Box provides a very impressive array of auditing features for system administrators to keep track of. With an access-monitoring control panel, detailed audit reports, geo IP access reports, pattern search and role-based administration, Box definitely shines in terms of logging user actions. However, mobile device management (which is vital in today's age of working on-the-go) is only offered to Enterprise Plan users. Box also lacks file analytics, which typically report a summary of client applications according to OS and type, user shares, active file-management, and file type distribution.

FileCloud offers a much more detailed audit log, with all of the above and the following additions: new account creations, logged-in users, common searches and the quantity of uploaded/downloaded files. Because just about every operation is optionally logged, we also offer the following log-management tools to avoid overly large audit database entries: removal of log entries with the administrative dashboard, configurable limits for which operations are logged and exportable .CSV archive log files. |

(*Id.*)

103.     That is, like Siminoff and unlike the claims of the '120 Patent, FileCloud tracks the store activity and the administrator has full tracking access.

104.     In sum, FileCloud does not infringe the claims of the '120 Patent and any reasonable due diligence would have rendered that conclusion.  Indeed, BCS' due diligence appears to have demonstrated non-infringement but was ignored by BCS.

## COUNTERCLAIM 2: SECTION 101 INVALIDITY

105.     The asserted claims are drawn toward abstract subject matter and have no inventive concept to save them at Step Two of the *Alice* calculus.   The claims cover the abstract idea of sending notifications from one computer to another via a server and employ generic functionality such as forwarding, permitting, and responding.   At Step Two, there is nothing in the claims that improve the functionality of the claimed method.

106.     Indeed, the claimed method has been performed by human beings for more than a century, e.g., with telephone operators who relay messages between two persons while staying on the line to communicate each message.

107.     Further, the asserted claims trigger preemptions concerns, as evidenced by the

disparate accused products.  *See* Case Nos. 6:21-cv-0019; 6:21-cv-0050; 6:21-cv-0050; 6:21-

0051.

## COUNTERCLAIM 2:

## SECTIONS 102 AND 103 INVALIDITY: LOTUS NOTES

108.     Douglas Engelbart first envisioned collaborative computing in 1951 and

documented his vision in 1962, with working prototypes in full operational use by his research

team by the mid-1960s, and held the first public demonstration of his work in 1968 in what is

now referred to as "The Mother of All Demos."  The following year, Engelbart's lab was hooked

into the ARPANET, the first computer network, enabling them to extend services to a broader

userbase.[8]

109.     Online collaborative gaming software began between early networked computer

users.  In 1975, Will Crowther created Colossal Cave Adventure on a DEC PDP-10 computer.

As internet connections grew, so did the numbers of users and multi-user games. In 1978 Roy

Trubshaw, a student at University of Essex in the United Kingdom, created the game MUD

(Multi-User Dungeon).

110.     The US Government began using truly collaborative applications in the early

1990s.  One of the first robust applications was the Navy's Common Operational Modeling,

Planning and Simulation Strategy (COMPASS).  The COMPASS system allowed up to 6 users

to create point-to-point connections with one another; the collaborative session only remained

while at least one user stayed active, and would have to be recreated if all six logged out. MITRE

---

[8] All of this is available on Wikipedia if BCS had done a simple Google search for collaborative
platforms prior to filing suit.

improved on that model by hosting the collaborative session on a server that each user logged into. Called the Collaborative Virtual Workstation (CVW), this allowed the session to be set up in a virtual file cabinet and virtual rooms, and left as a persistent session that could be joined later.

111.    Lotus Notes is but one example of prior art under Sections 102 and 103.

112.    Decades ago, Lotus Notes offered users a client/server architecture that featured PCs connected to a LAN.  A group could set up a dedicated server machine (a PC) that communicated with other groups' server machines (either on the same LAN or through switched networks). Servers exchanged information through replicated data (that is, there were potentially many copies of the same database resident on different servers, and the Notes server software continuously synchronized them).  This made it just as easy for users to exchange information with co-workers in a branch office as with those in their own office.[9]

113.    The vision of the founders quickly evolved into the idea of creating the first virtual community in 1984.

114.    Lotus Notes 6 had all of the claimed functionality of the '120 Patent.[10]

## COUNTERCLAIM 3:

## SECTIONS 102 AND 103 INVALIDITY: MICROSOFT SHAREPOINT 2001

115.    SharePoint, launched in 2001, was a web-based collaborative platform that integrated with Microsoft Office.

---

[9] https://www.ibm.com/developerworks/lotus/library/ls-NDHistory/ls-NDHistory-pdf.pdf ; https://thejournal.com/Articles/1996/11/01/Groupware-Improving-Group-Communication-and-Information-Dissemination.aspx?Page=2
[10] *Id*.

116.   By 2003, Windows SharePoint Services (WSPS) was a robust collaborative platform, containing each of the claimed elements of the '120 Patent.   Attached as Exhibit A is a review of WSPS, Dkt. No. 11, which is incorporated by reference herein.

## TRIAL BY JURY DEMANDED

CodeLathe respectfully seeks a trial by jury on all issues to triable.

## PRAYER FOR RELIEF

CodeLathe respectfully seeks:

- An order finding that FileCloud does not infringe the asserted claims of the '120 Patent;

- An order finding the asserted claims of the '120 Patent invalid;

- An order awarding fees and costs pursuant to 28 U.S.C. § 1927 and 35 U.S.C. § 285.


Respectfully submitted,


*Rachael D. Lamkin*
Rachael D. Lamkin (pro hac vice)
LAMKIN IP DEFENSE
One Harbor Drive, Suite 300
Sausalito, CA 94965
RDL@LamkinIPDefense.com


## CERTIFICATE OF SERVICE

On this date, July 27, 2021, I did personally serve a copy of CodeLathe's Answer and Counterclaims on counsel for Plaintiff via the Court's ECF system


*Rachael D. Lamkin*
Rachael D. Lamkin (pro hac vice)